**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is only binding on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4196-14T1

LISA HUNT, as guardian ad
litem of HAILEY ROSINA HUNT,
a minor, and LISA and RUSSELL
HUNT, as parents and natural
guardians of HAILEY ROSINA HUNT,
and LISA and RUSSELL HUNT,
individually,

    Plaintiffs-Appellants,

v.

VIRTUA HEALTH, INC., VIRTUA
WEST JERSEY HOSPITAL VOORHEES,
LINDA FARAGASSO, R.N.C., CHRISTINE
PEASE, R.N., and BARBARA JONES, R.N.,

    Defendants-Respondents,

and

WOMEN'S GROUP FOR OB/GYN,
PAMELA KOPELOVE, M.D., JEAN
TORRANCE, R.N.C., NOREEN
PALMAY, R.N., and DR. LYNCH,

    Defendants.[1]

---

[1] Virtua Health, Inc. was improperly pleaded as "Virtua"; Virtua West Jersey Hospital Voorhees was improperly pleaded as "Virtue Hospital" and "Virtua Health Systems Voorhees"; Linda Faragasso, R.N., was improperly pleaded as "L. Faragasso, R.N.C.,"; and Jean Torrance, R.N. was improperly pleaded as "Jean Torrance, R.N.C."

Argued September 20, 2016 — Decided July 14, 2017

Before Judges Messano, Espinosa and Guadagno.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-4509-11.

Michael J. Confusione argued the cause for appellants (Hegge & Confusione, LLC, and Creedon & Feliciani, P.C., attorneys; Mr. Confusione and Heather A. Thomas, of counsel and on the briefs).

Mary Kay Wysocki argued the cause for respondents Virtua Health, Inc., Virtua West Jersey Hospital Voorhees, Linda Faragasso, R.N., Barbara Jones, R.N., and Christine Pease, R.N. (Parker McCay, P.A., attorneys; Ms. Wysocki, Thomas M. Walsh and Andrew S. Winegar, on the brief).

PER CURIAM

Plaintiffs Lisa Hunt and Russell Hunt brought this medical malpractice action on behalf of themselves and their minor child Hailey Rosina Hunt (collectively, plaintiffs), alleging that defendants were negligent during Lisa's labor and the delivery of Hailey, causing extensive, permanent neurological injuries to Hailey. Plaintiffs appeal from the dismissal of their complaint against Virtua West Jersey Hospital Voorhees (Virtua Hospital) and Virtua Health, Inc. (collectively, Virtua); and Linda Faragasso, R.N., Barbara Jones, R.N., and Christine Pease, R.N.

(collectively, Nurses).[2]  For the reasons set forth in this opinion, we affirm.

I.

We summarize the facts pertinent to this appeal in the light most favorable to plaintiffs.  <u>Brill v. Guardian Life Ins. Co.</u>, 142 <u>N.J.</u> 520, 540 (1995); <u>R.</u> 4:46-2(c).

Lisa was admitted to Virtua Hospital at approximately 8:30 a.m. on September 7, 2009.  Dr. Kopelove and Faragasso were assigned as the attending physician and nurse, respectively, for the labor and delivery.

The Nurses assessed Lisa and Hailey in approximately thirty-minute intervals throughout the entire day, checking — among other things — Lisa's blood pressure and Hailey's fetal heart rate (FHR), including any variability, accelerations or decelerations.  Pease and Jones performed the assessments when Faragasso was unavailable.  Dr. Kopelove personally assessed Lisa and Hailey approximately every two hours or as needed.

---

[2] Plaintiffs' claims against Pamela Kopelove, M.D. and Women's Group for OB/GYN were settled.  Plaintiffs have not appealed from the order granting summary judgment to defendant nurses Jean Torrance, R.N., and Noreen Palmay, R.N.  It is unclear from the record what the disposition of plaintiffs' claims against Dr. Lynch was but those claims are not part of this appeal. Plaintiffs also made additional claims against all defendants that are not relevant to this appeal.

A-4196-14T1

Over the next six hours, Lisa was given morphine and an epidural, and her membranes were artificially ruptured. Variable decelerations in Hailey's FHR were consistently noted beginning at 11:30 p.m.

At 2:40 p.m., Dr. Kopelove gave orders to begin inducing labor by administering Pitocin, with a beginning flow rate of one milliunit per minute (mu/min). Before Pitocin was administered, preeclampsia labs were drawn. The urinalysis revealed protein in Lisa's urine, "a sign of pregnancy induced hypertension and/or preeclampsia." As a result, Dr. Kopelove ordered that magnesium sulfate be administered.

At 3:00 p.m., Pease began administering Pitocin at the rate ordered by Dr. Kopelove. The Pitocin was increased to two mu/min at 5:30 p.m., and then, per Dr. Kopelove's order, to four mu/min. at 6:00 p.m. At 6:10 p.m., the FHR decelerated to seventy-five, which constituted fetal bradycardia. Pitocin was turned off four minutes later at 6:14 p.m. due to the persistent late decelerations.

At 6:30 p.m., "a severe bradycardia episode occurred"; Dr. Kopelove determined that an emergency cesarean section (C-section) was necessary and Lisa "was rushed to the operating room." Hailey was delivered at 6:43 p.m. She was described at birth as "lifeless," "limp, apneic, [and] pale with no heart rate." The

diagnosis was severe asphyxia. Apgar scores were 0, 0 and 3 at one, five and ten minutes after birth, respectively.

Hailey suffers from permanent neurological damage including neurodevelopmental delay and cerebral palsy.

Plaintiffs filed their complaint in March 2012. The claims relevant to this appeal are: Virtua was negligent in credentialing and retaining Dr. Kopelove and the Nurses were negligent in treating Lisa and Hailey. We review each of these claims in turn.

## II.

Plaintiffs did not produce any expert report to articulate the standard of care applicable to their direct claims against Virtua. Nonetheless, they argue the trial judge erred in granting summary judgment to Virtua because expert testimony was not required. Plaintiffs also argue the trial judge abused his discretion in issuing protective orders that limited their ability to pursue their claims against Virtua. We are unpersuaded by these arguments.

Plaintiffs submit that expert testimony would only have been required if they had alleged "that Virtua 'should have known' about Dr. Kopelove's patient care problems yet failed to uncover her incompetence." They contend that because "Virtua actually knew about" Dr. Kopelove's "patient care issues and problems,"

5 A-4196-14T1

expert testimony was not necessary to establish their claims. No legal authority is cited to support this proposition.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). Expert testimony is generally indispensable to a plaintiff's burden of showing a breach of duty when "the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of a party was reasonable." Butler v. Acme Markets, Inc., 89 N.J. 270, 283 (1982). In Davis v. Brickman Landscaping, Ltd., 219 N.J. 395 (2014), the Court noted that, in addition to the ordinary dental or medical malpractice action, the following types of cases have been acknowledged to concern matters sufficiently esoteric to require expert testimony:

> "the responsibilities and functions of real-estate brokers with respect to open-house tours," precautions necessary to ensure "the safe conduct of a funeral procession," the appropriate "conduct of those teaching karate," the proper application of "pertinent skydiving guidelines," and the proper "repair and inspection" of an automobile.
>
> [Id. at 407-08 (citations omitted).]

Plaintiffs describe the duty breached by Virtua as a duty "to select only competent physicians to appoint to its medical staff and to sufficiently oversee the physician's care within the walls of its facility." To determine the scope of such a duty without

6

resorting to rank speculation, the jury would have to have an appreciation of what constituted a "competent" physician and what oversight was sufficient. Certainly, these are matters no less esoteric than any of the cases noted by the Supreme Court in <u>Davis</u>. We therefore discern no abuse of discretion in the trial judge's determination that expert testimony was necessary to support plaintiffs' claims. Because plaintiffs could not sustain their burden of establishing both a duty and the breach of that duty, Virtua was entitled to judgment as a matter of law. See <u>Rowe v. Mazel Thirty, LLC</u>, 209 <u>N.J.</u> 35, 41 (2012) (noting that "the moving party is entitled to summary judgment as a matter of law" unless "there is a genuine issue as to any material fact").

## III.

Plaintiffs also challenge the trial court's entry of protective orders entered in May and June 2014 that prohibited discovery on: (1) materials pertaining to Dr. Kopelove's guilty plea to a driving while intoxicated (DWI) offense in 2008[3]; (2) Virtua's peer review of issues regarding Dr. Kopelove; and (3) Virtua's investigation of prior incidents involving Dr. Kopelove.

---

[3] The trial judge found the DWI conviction was not relevant in the absence of any evidence that she was under the influence at the time she treated plaintiffs or that the charge had any impact on her ability to adhere to the appropriate standard of care, and also found the only purpose for such discovery was to intimidate, harass, offend and embarrass Dr. Kopelove.

Plaintiffs settled their claims against Dr. Kopelove in November 2014 and argue that these orders impeded their ability to pursue their claims against Virtua. They do not, however, argue that the entry of the protective orders precluded them from obtaining an expert to establish breach of duty by Virtua, a failure that justified summary judgment in Virtua's favor. Because summary judgment was properly granted on that basis, plaintiffs' challenges to the protective orders are moot and therefore warrant only limited discussion.

We review this issue pursuant to an abuse of discretion standard. C.A. ex rel. Applegrad v. Bentolila, 219 N.J. 449, 459 (2014). We are satisfied that plaintiffs' argument regarding the discovery of Dr. Kopelove's DWI conviction lacks sufficient merit to warrant discussion, R. 2:11-3(e)(1)(E), and discern no abuse of discretion as to the other challenged rulings.

The May 2014 order prohibited discovery of

> any factual information regarding the reviews and/or meetings conducted by the Virtua Medical Staff, Obstetrics Department and other members of the Executive and Administrative Staff of [Virtua] regarding complaints, incidents, and other issues raised about the behavior of [Dr. Kopelove] at Virtua Hospital.

Defendants sought a second protective order to protect documents relating to Dr. Kopelove's patient care issues, specifically Virtua's investigation of an incident in May 2009.

In June 2014, following an in camera review of the withheld documents, the trial court observed that they concerned Virtua's investigation of a patient care event in May 2009 and that, pursuant to N.J.S.A. 45:1-36, such materials remain confidential "if the result of the inquiry is a finding of no basis for disciplinary action." The June 2014 order prohibited plaintiffs "from demanding or eliciting in discovery any information regarding issues investigated and addressed at Virtua regarding the actions of Dr. Kopelove, including but not limited to the incident of May 2009."[4]

Plaintiffs argue the trial court made the following errors in these rulings: (1) failing to make specific determinations regarding each document that was withheld as required by Payton v. New Jersey Turnpike Authority, 148 N.J. 524 (1997); (2) misconstruing N.J.S.A. 45:1-36 by interpreting it to extend confidentiality after there has been a final disposition in an investigation; and (3) declaring the materials not relevant to plaintiffs' claims against Virtua. These arguments lack merit.

---

[4] Plaintiffs argue that they were entitled to discovery of the documents protected in the June 2014 order pursuant to the common law privilege recognized in Christy v. Salem, 366 N.J. Super. 535, 543 (App. Div. 2004). Although the trial court apparently failed to consider the competing interests of the plaintiff's right to discover the information for litigation purposes and the public interest involved to determine if the peer review privilege applied, id. at 541; see Applegrad, supra, 219 N.J. at 465; any error is of no consequence because this issue is moot.

A-4196-14T1

In the first instance, plaintiffs' reliance on <u>Payton</u> is misplaced. In <u>Payton</u>, <u>supra</u>, 148 <u>N.J.</u> at 554, the Court determined that remand was necessary for the trial court to conduct an in camera review of the documents at issue. The trial court did so here prior to making its determination the documents should remain confidential pursuant to <u>N.J.S.A.</u> 45:1-36. Absent any authority that would require a trial court to provide "specific determinations" regarding precluded discovery in every case, plaintiffs' argument fails.

Plaintiffs' second argument — that the trial court "misapplied" <u>N.J.S.A.</u> 45:1-36 because the withheld information should have been released after the final disposition of the investigation — also lacks merit. <u>N.J.S.A.</u> 45:1-36 explicitly states:

> If the result of the inquiry or investigation is a finding of no basis for disciplinary action, the information <u>shall remain confidential</u>, except that the board or division, as applicable, may release the information to a government agency to facilitate the discharge of its public responsibilities.
>
> [(Emphasis added).]

In light of the fact that the materials continued to be protected as confidential, plaintiffs' last argument, that the materials were relevant, has no merit.

Accordingly, we discern no abuse of discretion in the issuance of the protective orders.

                                    IV.

We next turn to the arguments presented by plaintiffs relating to their claims against the Nurses. These arguments arise from the trial court's grant of summary judgment to the Nurses based upon its determination that the plaintiffs failed to establish proximate causation. Plaintiffs initially presented an expert report by a nurse practitioner to support their argument that the Nurses breached a duty that proximately caused Hailey's injuries. They argue the trial court erred in finding the nurse practitioner was not qualified to render an opinion on proximate cause.[5] Plaintiffs also argue the trial court erred in barring a supplemental expert report provided by a physician on the issue of proximate causation.

To provide context for these issues, we note that the complaint was filed in March 2012. In May 2014, a trial notice

---

[5] Plaintiffs argued in the alternative that a jury could have found proximate cause proven by application of the "substantial factor" analysis in the absence of expert opinion. This argument lacks sufficient merit to warrant discussion, R. 2:11-3(e)(1)(E), beyond the following brief comment. "New Jersey courts apply the substantial factor test in medical malpractice cases involving preexisting conditions." Reynolds v. Gonzalez, 172 N.J. 266, 280 (2002). Because plaintiffs did not allege there was a preexisting condition, their claim would not be properly subject to analysis under the substantial factor test.

A-4196-14T1

set the fourth listing for trial, November 10, 2014. Plaintiffs' expert reports were due June 30, 2014. A court order was entered on August 15, 2014, requiring defendants to submit expert reports by September 12, 2014, and plaintiffs to submit rebuttal expert reports by October 20, 2014. In addition, the order explicitly provided that the October 10, 2014 discovery end date would not be extended.

A.

Plaintiffs timely served expert reports from Dr. Bruce L. Halbridge, an obstetrics expert, and Jennifer Johnson, R.N., a registered nurse and board-certified nurse practitioner in women's health. The contents of these reports plainly reveal that Dr. Halbridge's opinion was intended to support plaintiffs' claim against Dr. Kopelove and Johnson's opinion was intended to provide the necessary expert opinion to support plaintiffs' claims against the Nurses.

Dr. Halbridge's report identified the following "[d]epartures":

> 1. The failure of Dr. Kopelove to recognize the presence of:
>
> > a) Recurrent late and variable decelerations
> > b) Significant and persistent loss of fetal heart variability
>
> 2. The failure of Dr. Kopelove to deliver the fetus by [1:30 p.m.] due to the presence

12

of recurrent late and variable fetal heart rate decelerations and significantly decreased fetal heart rate variability indicating fetal hypoxia.

3. The failure of Dr. Kopelove to recognize that it is contraindicated to administer Pitocin to increase contraction frequency, intensity, and duration in the presence of recurrent late and variable fetal heart rate decelerations and associated significantly decreased fetal heart rate variability.

In defining the damages suffered, Dr. Halbridge found Dr. Kopelove's "failure to deliver the fetus by [1:30 p.m.] . . . was the direct and proximate cause of the avoidable and permanent neurologic damage suffered by the baby." Dr. Halbridge's report offered no opinions regarding the quality of the nursing care that was provided or that the care provided by the Nurses contributed to the injury.

Johnson's report critiqued the nursing care provided to Lisa and Hailey and opined that it "did not meet the standard required and expected for such care <u>resulting in the injury to the child</u>." (Emphasis added). She identified specific deviations from the standard of care by the nurses that included "[f]ailure to properly assess ongoing fetal well being and uterine activity throughout labor." She also found the monitoring revealed contraindications that rendered "[t]he initiation and continuation of Pitocin . . . a breach of the standard of care <u>by the labor and delivery nurses</u>

which put [Hailey] at increased risk for hypoxia as exhibited by the recurring decelerations."  (Emphasis added).

Pursuant to Rule 4:46-1, summary judgment motions had to be filed in time to have a return date thirty days prior to the November 10, 2014 trial date.  The Nurses moved for summary judgment in August 2014, arguing plaintiffs had failed to present an admissible expert opinion on causation because Dr. Halbridge had not rendered such an opinion and Johnson, a nurse practitioner, could not "establish medical causation."  The trial court agreed and entered an order granting summary judgment to the Nurses on September 19, 2014, dismissing the complaint and all cross-claims with prejudice.

Plaintiffs attempted to revive their claims against the Nurses by submitting new expert reports by Dr. Halbridge and Johnson and filing a motion for reconsideration.

As we have noted, in his first report, Dr. Halbridge offered no opinions regarding the nurses and laid the blame for Hailey's injuries squarely and unequivocally upon Dr. Kopelove, stating her failure to deliver the fetus approximately five hours earlier "was the direct and proximate cause of" Hailey's injuries.

Dr. Halbridge prefaced his second report with: "In this report I will list additional departures from the standard of care. . . ."  The "additional departures," however, did not address Dr.

14

Kopelove's departures from the standard of care.  Instead, for the first time, he added "[t]he Labor [and] Delivery nurses" as persons who deviated from the standard of care and caused Hailey's injuries.  Their alleged deviations were that, like Dr. Kopelove, they failed to recognize the presence of repetitive variable and late decelerations in the presence of significantly reduced variability that clearly indicated that the fetus was experiencing significant hypoxia and needed to be delivered promptly.

Dr. Halbridge did not opine that the Nurses had any duty to take action to override, rather than follow, the orders given by Dr. Kopelove throughout Lisa's labor.

In her supplemental report,[6] Johnson opined for the first time that the Nurses breached a duty in failing to challenge Dr. Kopelove's orders:

> If the nurse is concerned about the progression or issues of variability and compromise of the infant or the Mother the nurse is required to follow the chain of command per policy in order to assure a positive outcome in both the Mother and infant.  In failing to do so, the labor and delivery nurses in this situation breached the standard of care and [sic] resulting in the injury to [Hailey].

---

[6] Johnson's supplemental report was provided after the due date for plaintiffs' rebuttal reports.

These reports were submitted as rebuttal reports and as grounds for the trial court to reconsider its order granting summary judgment.

Reconsideration is not appropriate merely because a litigant is dissatisfied with a decision of the court or wishes to reargue a motion. Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010). To be entitled to reconsideration, "a litigant must initially demonstrate that the Court acted in an arbitrary, capricious, or unreasonable manner, before the Court should engage in the actual reconsideration process." D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990). Reconsideration is properly utilized only in cases "in which either 1) the Court has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence." Palombi, supra, 414 N.J. Super. at 288 (quoting D'Atria, supra, 242 N.J. Super. at 401). Plainly, the submission of new expert reports that differed from the reports available when the summary judgment motion was decided did not bring the trial court's decision within either of these two narrow categories of cases in which reconsideration is appropriate. Notwithstanding the dubious grounds for granting reconsideration, the trial court found that Dr. Halbridge's new report established causation as to

Faragasso. By order dated October 27, 2014, the trial court granted reconsideration in part, reinstating plaintiffs' claims against Faragasso, but affirmed the dismissal of claims against Jones and Pease.

Thereafter, defendants moved to bar Dr. Halbridge's and Johnson's supplemental expert reports, arguing they did not constitute proper rebuttal. The trial court barred Dr. Halbridge's report, later clarifying that only the new opinions expressed on the standard of care and causation regarding the Nurses were barred. The trial court denied defendant's motion to bar Johnson's report, finding that her opinion as to the chain-of-command was a logical extension of her initial report.

Faragasso filed a motion for summary judgment, arguing that since Dr. Halbridge's opinion regarding the Nurses was barred, there was no admissible opinion that any alleged deviation attributed to her caused Hailey's injuries. Plaintiffs argued Johnson's opinion that the Nurse's actions increased the risk of harm to Hailey "satisfie[d] the causation requirements." The trial court agreed with Faragasso that this was a medical diagnosis Johnson was not qualified to make; and thus, without Dr. Halbridge's rebuttal report, plaintiffs could not establish causation as to Faragasso. The trial court granted summary

judgment to Faragasso, and dismissed the complaint and any cross-claims with prejudice.

B.

We turn first to the argument that the trial court erred in concluding Johnson was not qualified to render the requisite opinion regarding causation.

"Ordinarily, the competency of a witness to testify as an expert is remitted to the sound discretion of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." Carey v. Lovett, 132 N.J. 44, 64 (1993); see also Townsend, supra, 221 N.J. at 52-53.

A plaintiff in a medical malpractice action "must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (citation omitted). To establish proximate cause, the "plaintiff must prove that [the] defendant's conduct constituted a cause in fact of his injuries and loss. An act or omission is not regarded as a cause of an event if the event would have occurred without it." Skripek v. Bergamo, 200 N.J. Super. 620, 634 (App. Div.), certif. denied, 102 N.J. 303 (1985).

Usually, a witness presented as an expert "must be a licensed member of the profession whose standards he professes to know." Sanzari v. Rosenfeld, 34 N.J. 128, 136 (1961). However, licensed or even unlicensed individuals involved in another profession can testify as an expert "depend[ing] on the claim involved, the specific allegations made, and the opinions that the expert proposes to offer at trial." Garden Howe Urban Renewal Assocs. v. HACBM Architects Eng'rs Planners, L.L.C., 439 N.J. Super. 446, 456 (App. Div. 2015).

It is undisputed that the causation issue in this case requires sufficient knowledge, training and experience to determine the cause of a complex neurological injury in the context of labor and delivery. Plaintiffs rely on the Advanced Practice Nurse Certification Act (APNCA), N.J.S.A. 45:11-45 to -52, to support their argument that Johnson was qualified to opine on the causation issue in this case. N.J.S.A. 45:11-49(a), articulates the [p]ermitted duties of [an] advanced practice nurse"[7] and states:

> In addition to all other tasks which a registered professional nurse may, by law, perform, an advanced practice nurse may manage preventive care services and diagnose and manage deviations from wellness and long-term illnesses, consistent with the needs of the

---

[7] Under the APNCA, the titles "advanced practice nurse," "nurse practitioner" and "clinical nurse specialist" are used interchangeably. N.J.S.A. 45:11-46(c).

> patient and <u>within the scope of practice</u> of the advanced practice nurse, by:
>
> > (1) initiating laboratory and other diagnostic tests;
> > (2) prescribing or ordering medications and devices, as authorized by subsections b. and c. of this section; and
> > (3) prescribing or ordering treatments, including referrals to other licensed health care professionals, and performing specific procedures in accordance with the provisions of this subsection.
>
> [(Emphasis added).]

Plaintiffs argue legislative amendments clarify that the scope of an advanced practice nurse's permitted practices exceeds that of a registered nurse and encompasses the diagnosis and management of a patient's condition. Notably, however, the statute does not provide any clear authority that an advanced practice nurse may diagnose the neurological injury at issue here or, more important, how it was caused. We note further that the autonomy of an advanced practice nurse is limited. <u>N.J.A.C.</u> 13:37-8.1 requires that a nurse practitioner be supervised by an appropriate physician under joint protocols or collaborative agreements.

Given the complexity of the medical causation in this case and the limits upon Johnson's scope of expertise, we cannot conclude the trial court abused its discretion in concluding she was not qualified to render the requisite opinion on causation.

Relying upon Kemp v. State, 174 N.J. 412 (2002), plaintiffs also contend the trial court erred in ruling Johnson was not qualified to render an opinion without first conducting, sua sponte, an N.J.R.E. 104 hearing. Because plaintiffs did not ask the trial court to conduct an N.J.R.E. 104 hearing, we review this argument for plain error. R. 2:10-2.

In Kemp, supra, 174 N.J. at 432, the Court held it was plain error for the trial court to exclude the testimony of an expert without conducting an evidentiary hearing to determine the reliability of the expert's testimony. The issue in Kemp was whether the expert's analysis was "scientifically reliable," meaning "the scientific medical community accepts the process by which [the expert] arrived at his conclusion as one that is consistent with sound scientific principles." Id. at 430-31. Although the Court noted that an in limine hearing provides an efficient means for determining the reliability of expert testimony when a Daubert[8] objection is raised, it did not require an in limine hearing in every case in which such an objection is made:

> Whether to hold one rests in the sound discretion of the [trial] court. But when the ruling on admissibility turns on factual issues, as it does here, at least in the

[8] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

21                                                        A-4196-14T1

> summary judgment context, failure to hold such a hearing may be an abuse of discretion.
>
> [<u>Id.</u> at 428 (quoting <u>Padillas v. Stork-Gamco, Inc.</u>, 186 <u>F.</u> 3d 412, 418 (3d Cir. 1999)).]

There was no <u>Daubert</u> objection here. The issue regarding the admissibility of Johnson's expert opinion was not its scientific reliability but, rather, whether the witness was qualified in her profession to render an expert opinion.

Plainly, the trial judge had the authority to conduct an in limine hearing regarding Johnson's qualifications to render an opinion on causation. <u>N.J.R.E.</u> 104(a) provides that a "judge may hear and determine" matters relating to "the qualification of a person to be a witness" at an in limine hearing. <u>See also</u> <u>Rubanick v. Witco Chem. Corp.</u>, 125 <u>N.J.</u> 421, 454 (1991); Biunno, Weissbard and Zegas, <u>Current N.J. Rules of Evidence</u>, comment 1 on <u>N.J.R.E.</u> 104 (2017) ("If there is a dispute about <u>the qualifications of a proffered expert witness</u> to testify in a particular field, a preliminary hearing may be utilized to resolve the question." But the decision to conduct a <u>N.J.R.E.</u> 104 hearing rests within the sound discretion of the trial court. <u>Kemp</u>, <u>supra</u>, 174 <u>N.J.</u> at 432. Under the circumstances here, we discern no abuse of discretion and, therefore, no plain error.

C.

Plaintiffs next contend the trial court abused its discretion by barring Dr. Halbridge's second expert report based on its finding that the report expressed "entirely new opinion[s]" rather than an appropriate rebuttal report. They argue the report was sufficiently related to Dr. Halbridge's first report because his initial opinions "applied to both Dr. Kopelove and [the Nurses]" and the alleged breaches by the Nurses arose from the same set of facts as for Dr. Kopelove. Plaintiffs also argue the additional opinions expressed by Dr. Halbridge constituted "proper rebuttal evidence . . . with respect to the causation element" because he "respond[ed] to the opinions set forth in the defense reports."[9]

The limited purpose of rebuttal evidence is to rebut evidence presented for the first time in the opposing party's case, and should not be cumulative or repetitive. D.G. ex rel. J.G. v. N. Plainfield Bd. of Educ., 400 N.J. Super. 1, 22-23 (App. Div.), certif. denied, 196 N.J. 346, cert. denied, 555 U.S. 1085, 129 S. Ct. 776, 172 L. Ed. 2d 756 (2008). Determining "[w]hat is proper rebuttal evidence and whether it should be admitted" is a decision

---

[9] Three of defendants' experts opined that the Nurses' actions during the labor and delivery met the appropriate standard of care. Three other defense experts opined that Hailey's injuries were due to preexisting conditions that defendants had no control over, with one expert stating: "Nothing the health care providers caring for Hailey's mother did or did not do could have prevented the child's injury."

that rests "within the sound discretion of the trial judge, and the exercise of that discretion will not be disturbed in the absence of gross abuse." State v. Sanducci, 150 N.J. Super. 400, 402 (App. Div.), certif. denied, 75 N.J. 524 (1977).

We discern no abuse of discretion in the trial court's decision to bar the opinion in Dr. Halbridge's supplemental report that the Nurses deviated from a standard of care that proximately caused the injury here. These opinions cannot remotely be considered an amplification of the opinion he expressed in his initial report, before summary judgment was granted to the Nurses, when he unequivocally opined that Dr. Kopelove's deviation was the proximate cause for the injury suffered. Rather than a genuine rebuttal report, this report represented a transparent effort to take a second bite at the apple after expert reports had been exchanged and summary judgment had been granted to the Nurses based on the very deficiency in expert opinion that Dr. Halbridge's second report was designed to cure.

Plaintiffs urge that they should be spared the ultimate sanction of dismissal with prejudice because lesser sanctions, such as an extension of discovery or the assessment of counsel fees and costs, could suffice to serve the interests of justice. We disagree.

The expert report plaintiffs seek to rely upon was not produced until October 20, 2014, approximately three weeks before the fourth listed trial date, after the October 10, 2014 discovery end date and after summary judgment had been granted to the Nurse defendants. No argument has been made that the opinion in question could not have been obtained and presented during the normal course of discovery. There are, then, no extraordinary circumstances to justify the late alteration in expert theory that was adopted to rescue plaintiffs' claims against the Nurses. See R. 4:24-1(c).

Moreover, even if Dr. Halbridge's report were accepted in full, it fails to establish a critical point necessary for the imposition of liability upon the Nurses. It is undisputed that Dr. Kopelove was the attending physician and that the Nurses followed her orders throughout labor. Dr. Halbridge opined that it was Dr. Kopelove's five-hour delay in ordering a C-section that was the proximate cause of Hailey's injuries. Nowhere in his supplemental report does Dr. Halbridge state the Nurses had grounds to attempt to override Dr. Kopelove's orders, a duty to do so and deviated from that duty. Absent that, his supplemental report fails to provide the requisite opinion regarding causation to support plaintiffs' claims against the Nurses. Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION